IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Michael R. Pass, | ) | C/A No. 0:15-208-TLW-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Carolyn W. Colvin, Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |

This social security matter is before the court for a Report and Recommendation pursuant to Local Civil Rule 83.VII.02 (D.S.C.). The plaintiff, Michael R. Pass, brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the defendant, Acting Commissioner of Social Security ("Commissioner"), denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Having carefully considered the parties' submissions and the applicable law, the court concludes that the Commissioner's decision should be affirmed.

## SOCIAL SECURITY DISABILITY GENERALLY

Under 42 U.S.C. § 423(d)(1)(A), (d)(5) and § 1382c(a)(3)(H)(i), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R.

§§ 404.1505(a), 416.905(a); see also Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1973).  The regulations require the ALJ to consider, in sequence:

    (1)    whether the claimant is engaged in substantial gainful activity;

    (2)    whether the claimant has a "severe" impairment;

    (3)    whether the claimant has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), and is thus presumptively disabled;

    (4)    whether the claimant can perform his past relevant work; and

    (5)    whether the claimant's impairments prevent him from doing any other kind of work.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[1]  If the ALJ can make a determination that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  Id.

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments.  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience, and impairments, to perform alternative jobs that exist in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); see also McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983); Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980).  The Commissioner may carry this burden by

---

[1] The court observes that effective August 24, 2012, ALJs may engage in an expedited process which permits the ALJs to bypass the fourth step of the sequential process under certain circumstances.  20 C.F.R. §§ 404.1520(h), 416.920(h).



obtaining testimony from a vocational expert.  Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983).

## ADMINISTRATIVE PROCEEDINGS

In February 2009, Pass applied for DIB and SSI, alleging disability beginning October 1, 2008.  Pass's applications were denied initially and upon reconsideration, and he requested a hearing before an administrative law judge ("ALJ").  A hearing was held on November 19, 2010, at which Pass, who was represented by James C. Alexander, Esquire, appeared and testified.  After hearing testimony from a vocational expert, the ALJ issued a decision on April 5, 2011 concluding that Pass was not disabled.  (Tr. 276-84.)  The Appeals Council granted Pass's request for review and issued an Order on September 28, 2012 vacating the hearing decision and remanding the case for further proceedings.  (Tr. 291-93.)  Specifically, the Appeals Council found that the hearing decision did not contain an adequate evaluation of the treating source opinions submitted by Dr. Travis Davis, and that new material evidence had been received, and instructed the ALJ as follows:

- Obtain evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.912-913).  The additional evidence may include, if warranted and available, consultative orthopedic and mental status examinations and medical source statements about what the claimant can still do despite the impairments.

- If necessary, obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairments (20 CFR 404.1527(f) and 416.927(f) and Social Security Ruling 96-6p).

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p).  In so doing, further evaluate the treating source opinions, pursuant to the provisions of 20 CFR 404.1527 and 416.927 and



Social Security Rulings 96-2p and 96-5p, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating source to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments (20 CFR 404.1512 and 416.912). The Administrative Law Judge may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating source.

- Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(Id.)

A second hearing was held on July 2, 2013, at which Pass appeared and testified and continued to be represented by James C. Alexander, Esquire.[2] The ALJ also heard testimony from a vocational expert. Because the ALJ determined a need for additional evidence, he sent Pass for a consultative examination and the held a supplemental hearing on March 28, 2014. Pass again appeared and testified, as did a vocational expert. The ALJ issued a decision on August 4, 2014 finding that Pass was not disabled. (Tr. 11-58.)

Pass was born in 1971 and was thirty-seven years old at the time of his alleged disability onset date. (Tr. 57.) He has a high-school education and has past relevant work experience as an

---

[2] Because the ALJ who had issued the April 5, 2011 had retired at the time Pass's case was remanded from the Appeals Council, a new ALJ was assigned to the case.



assembly worker, a custodian, and a supervisor/machine operator. (Tr. 408, 412.) Pass alleged

disability due to a learning disability, depression, anxiety, panic attacks, and back problems. (Tr.

407.)

In applying the five-step sequential process, the ALJ found that Pass had not engaged in

substantial gainful activity since October 1, 2008—his alleged onset date. The ALJ also determined

that Pass's lumbar degenerative disc disease with lumbar radiculopathy, headaches, borderline

intellectual functioning, a depressive disorder, a psychotic disorder, and an anxiety disorder were

severe impairments. However, the ALJ found that Pass did not have an impairment or combination

of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR

Part 404, Subpart P, Appendix 1 (the "Listings"). The ALJ further found that Pass retained the

residual functional capacity to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except in an
> 8-hour workday, he can stand 2 hours, walk 2 hours, and sit 4 hours. He needs a sit
> stand option at 30 minute intervals without being away from his work station. He
> can never climb ladders, ropes or scaffolds, or use his left lower extremity to
> push/pull. He can frequently reach, but only occasionally reach overhead. He can
> occasionally climb, balance, stoop, kneel crouch, and crawl. He must avoid
> concentrated exposure to temperature extremes, humidity, vibration, and to hazards.
> He can do simple 1-2 step tasks with occasional contact with the public, and frequent
> contact with coworkers and supervisors.

(Tr. 21.) The ALJ found that Pass was unable to perform any past relevant work but that,

considering Pass's age, education, work experience, and residual functional capacity, there were jobs

that existed in significant numbers in the national economy that Pass could perform. Therefore, the

ALJ found that Pass was not disabled from October 1, 2008 through the date of his decision.

The Appeals Council denied Pass's request for review on November 13, 2014, making the

decision of the ALJ the final action of the Commissioner. (Tr. 1-4.) This action followed.

Page 5 of 32



## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also 42 U.S.C. § 405(g); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Thus, the court may review only whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied. See Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig, 76 F.3d at 589. In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Id. Accordingly, even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence. Blalock, 483 F.2d at 775.

## ISSUES

Pass raises the following issues for this judicial review:

I.     The ALJ failed to comply with the Appeals Council Remand Order[.]

II.    The ALJ failed to properly consider the medical opinion evidence.

III.   The ALJ did not explain his findings regarding the Plaintiff's residual capacity, as required by Social Security Ruling 96-8p.[]

IV.    The ALJ failed to properly assess Pass' credibility[.]



V.      The ALJ failed to evaluate whether Pass met Listing 1.04 A[.]

(Pl.'s Br., ECF No. 18.)

## DISCUSSION

### A.      Appeals Council Order

Pass first appears to argue that the ALJ erred in sending Pass for a consultative examination in accordance with the Appeals Council's order and then rejecting it in part because the consultative examiner was not an orthopedic specialist.  To the extent that Pass is suggesting that because the ALJ ordered the consultative examination he must accept its findings, the court disagrees.  As argued by the Commissioner, the ALJ was required to weigh the opinion evidence in accordance with the applicable regulations.[3]  Pass also appears to argue that the ALJ failed to comply with the Appeals Council's order by failing to obtain a consultative examination from an *orthopedist*.  The court observes that while the order stated that the Appeals Council found "a consultative examination is necessary to assess the claimant's current functional limitations following his March 2011 discectomy and laminectomy" (Tr. 291), the Appeals Council directed the ALJ to

> [o]btain evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.912-913).  The additional evidence *may include, if warranted and available,* consultative orthopedic and mental status examinations and medical source statements about what the claimant can still do despite the impairments.

(Tr. 292) (emphasis added).  Thus, Pass cannot demonstrate that the ALJ failed to comply with any order from the Appeals Council, as he did direct the performance of a consultative examination that included an orthopedic component.

---

[3] Pass also challenges the ALJ's evaluation of this opinion evidence which is discussed below.  See infra Section B.1.



Pass also points out that after the ALJ obtained the consultative examination but before the March 28, 2014 supplemental hearing, the ALJ extended an offer to Pass to award Pass benefits as of the date of the consultative examination, October 10, 2013. Pass declined the offer. Thus, Pass argues that the ALJ erred in subsequently finding that the opinion of the consultative examiner was not sufficiently significant to support a partially favorable decision.

The ALJ addressed this issue in his decision. Specifically, after explaining the offer and Pass's rejection, the ALJ stated as follows:

> However, after [the supplemental] hearing and reviewing again the longitudinal record, including the claimant's testimony at both hearings, his many conflicting statements as well as the inaccurate statements made by the claimant to [the consultative examiner] and on which she seemingly based much of her opinion, I have concluded that the above RFC is an appropriate reflection of the most the claimant can do.

(Tr. 22.)

The court finds that Pass has failed to demonstrate any error by the ALJ. As an initial matter, Pass rejected the offer that was extended prior to the supplemental hearing and the ALJ's ultimate evaluation of all of the evidence. Moreover, there is no indication that at the time the offer was made that the ALJ had reviewed all the evidence and made any determinations that Pass was entitled to benefits as a matter of law; rather, the ALJ attempted to resolve the matter and Pass rejected the ALJ's proposed resolution. Thus, Pass has not demonstrated an error by the ALJ or that his ultimate decision, although arguably contrary to the earlier offer, was unsupported by substantial evidence. See, e.g., Hull v. Comm'r of Soc. Sec., No. C-1-00-782, 2001 WL 1580245, at *2-*3 (S.D. Ohio Dec. 12, 2001) (disagreeing with the plaintiff's argument that the ALJ erred by failing to find

plaintiff disabled after the plaintiff rejected an ALJ's settlement offer for a closed period of disability).

**B.    Opinion Evidence**

Next, Pass argues that the ALJ failed to properly consider medical opinion evidence. Regardless of the source, the Commissioner will evaluate every medical opinion received. 20 C.F.R. §§ 404.1527(c), 416.927(c). Typically, the Social Security Administration accords greater weight to the opinion of treating medical sources because treating physicians are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (*per curiam*). Rather, a treating physician's opinion is evaluated and weighed "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). Any other factors that may support or contradict the opinion should also be considered. 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6). In the face of "persuasive contrary evidence," the ALJ has the discretion to accord less than controlling weight to such an opinion. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Further, " 'if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.' " Id. (quoting Craig, 76 F.3d at 590).



Additionally, SSR 96-2p provides that

a finding that a treating source medical opinion is not well-supported by medically
acceptable clinical and laboratory diagnostic techniques or is inconsistent with the
other substantial evidence in the case record means only that the opinion is not
entitled to "controlling weight," not that the opinion should be rejected. Treating
source medical opinions are still entitled to deference and must be weighed using all
of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating
source's medical opinion will be entitled to the greatest weight and should be
adopted, even if it does not meet the test for controlling weight.

SSR 96-2p, 1996 WL 374188, at *5. This Ruling also requires that an ALJ's decision "contain
specific reasons for the weight given to the treating source's medical opinion, supported by the
evidence in the case record, and must be sufficiently specific to make clear to any subsequent
reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons
for that weight." Id., at *5.

Moreover, the ALJs are instructed to apply the above factors—including the length and
nature of the source's treatment relationship with the claimant, the supportability of the opinion, the
opinion's consistency with the other evidence in the record, whether the source is a specialist, and
any other factors that may support or contradict the opinion—to all medical opinions, including those
from consultative examiners and medical sources who are not acceptable medical sources.[4]  20
C.F.R. §§ 404.1527(c), 416.927(c). Importantly, generally more weight is given to the opinions of
an examining source than a non-examining one. Id. Additionally, more weight is generally given
to opinions of treating sources than non-treating sources, such as consultative examiners. Id.

Only acceptable medical sources can establish the existence of a medically determinable
impairment, give medical opinions, and be considered treating sources whose opinions may be

---

[4] In evaluating opinions from other sources, not every factor may apply. SR 06-03p, 2006
WL 2329939, at *5.



entitled to controlling weight; however, medical sources who are not acceptable medical sources may

provide opinions reflecting "the source's judgment about some of the same issues addressed in

medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis,

and what the individual can still do despite the impairment(s), and physical or mental restrictions."

SSR 06-03p, 2006 WL 2329939, at *5.  Social Security Ruling 06-03p further provides:

> Although there is a distinction between what an adjudicator must consider and what
> the adjudicator must explain in the disability determination or decision, the
> adjudicator generally should explain the weight given to opinions from these "other
> sources," or otherwise ensure that the discussion of the evidence in the determination
> or decision allows a claimant or subsequent reviewer to follow the adjudicator's
> reasoning, when such opinions may have an effect on the outcome of the case. In
> addition, when an adjudicator determines that an opinion from such a source is
> entitled to greater weight than a medical opinion from a treating source, the
> adjudicator must explain the reasons in the notice of decision . . . .

Id., at *6.

### 1.    Dr. Susan Tankersley

As indicated above, upon remand from the Appeals Council, the ALJ directed the

performance of a consultative examination, which was ultimately performed by Dr. Susan

Tankersley.  Pass first argues that the ALJ erred in evaluating the opinion of Dr. Tankersley because

the ALJ failed to cite her opinion, mention all of her objective findings, or list the limitations opined

by Dr. Tankersley.  Contrary to Pass's allegation that the ALJ failed to cite to Dr. Tankersley's

opinion, the ALJ's decision reflects that the ALJ summarized Dr. Tankersley's opinion[5] (Tr. 28-29)

and discussed his evaluation of the opinion pursuant to 20 C.F.R. § 404.1527(c).[6]  (Tr. 49-52.)

---

[5] The court notes that in portions of the ALJ's decision, the ALJ spells Dr. Tankersley's name
as Dr. Tankersely.

[6] Additionally, throughout the 48-page decision, the ALJ references reports by Pass to Dr.
Tankersley as well as observations by Dr. Tankersley.



In weighing Dr. Tankersley's opinion, the ALJ observed that she is an examining but not treating physician and that she indicated that her opinion was based on her clinical observations and a review of the available record.  However, the ALJ stated that Dr. Tankersley's "report indicates she actually saw only the report of Dr. Bucci's surgery and the 2012 lumbar MRI."[7]  (Tr. 49.)  The ALJ found that Dr. Tankersley "relied on the claimant's statements regarding his other diagnostic tests and his medical history, which, given their inaccuracies, undermines the validity of her report." (Id.)  The ALJ provided several examples of Pass's inconsistent statements regarding allegations (1) of longstanding back pain, including inaccuracies of his prior treatment and test results; (2) of syncopal episodes, which subsequent tests ruled out; (3) of the absence of tests for his migraine headaches, which the record disputes by revealing a neurological workup, all of which were negative; and (4) that his back surgery only decreased his pain for a week or two, which numerous records contradicted. (Tr. 49-50.)  The ALJ found that "[w]hile Dr. Tankers[le]y commented, 'I also do not really understand as to why he is on no analgesics of any sort at all,' the answer appears to be first that he did not need them, and later simply that he chose not to take them" and proceeded to provide examples supporting this finding.  (Tr. 51.)  The ALJ also determined that that finding was an indication that Pass's pain was not as severe as he alleged.  The ALJ continued,

> While Dr. Tankers[le]y commented, "I am unsure as to why he was not considered a surgical candidate the second time around, given the focal and acute nature of the MRI findings," the answer may be that her interpretation of the 2012 MRI (i.e., "recurrent L5-S1 disk herniation with right [S]1 nerve root impingement per MRI of 2012") is contradicted by that of Dr. Bucci, his treating neurosurgeon, who stated that it indicated "scar tissue and possibly some small disc bulge" but that "the nerve root is not trapped or displaced" (Ex.22F).  The problem seems to be that she read the radiologist's report whereas Dr. Bucci, his treating neurosurgeon, interpreted the

---

[7] Dr. Michael Bucci is Pass's treating neurosurgeon who performed a right L5-S1 laminectomy, facetectomy, foraminotomy, and discectomy on March 14, 2011.



> actual MRI. Based on the MRI, his observations during the original surgery, and his physical examination of the claimant that day, Dr. Bucci concluded there was no evidence of severe degenerative disk disease and thus this was not a surgical issue, and referred him to Dr. Patel for pain management (Ex.22F). The record does support her diagnosis of lumbar radiculopathy, but does not indicate any functional limitations other than some right leg giveway.

(Tr. 51.) The ALJ also found that Dr. Tankersley's diagnoses of angulated left knee with chronic intermittent left knee pain, longstanding history of bipolar disorder, and syncope of uncertain etiology were either not supported by the longitudinal record or were contradicted by it and his other doctors. Finally, the ALJ concluded as follows:

> In evaluating Dr. Tanker[sle]y's opinion, I have considered that as a physician who frequently performs evaluations for the state agency, she presumably understands the Commissioner's disability programs and their evidentiary requirements. At the same time, her area of medical specialty is family medicine, not orthopedics, neurology, neurosurgery, or psychiatry, and as her opinion on these medical areas is contrary to that of h[is] treating specialists, I do not assign them significant weight.

> However as I noted, Dr. Tankers[le]y was handicapped by the absence of medical records to review, misleading statements by the claimant, and a questionable medical presentation. For the foregoing reasons, I can assign little weight to her opinion, including her *Medi[c]al Source Statement of Ability to Do work-Related Activities (Physical)*.

(Tr. 51-52.) Moreover, as indicated above, earlier in the decision the ALJ concluded that his residual functional capacity determination was an appropriate reflection of the most the claimant can do, in part based on Pass's "many conflicting statements as well as the inaccurate statements made by the claimant to Dr. Tankers[le]y and on which she seemingly based much of her opinion." (Tr. 22.)

Pass points out that the ALJ and Dr. Tankersley both determined that Pass could perform light work, stand for two hours, walk for two hours, and sit for four hours, with a thirty-minute sit/stand option, but that Dr. Tankersley further found that Pass could not climb, balance, stoop, kneel, crouch, or crawl and required use of a cane to ambulate. Pass argues that the ALJ failed to



explain why he appears to have adopted the majority of her limitations but omitted the others. However, while the ALJ may not have specifically mentioned any of these limitations, it is clear the ALJ assigned her opinion little weight, as these limitations were included in the "Medical Source Statement of Ability to do Work-Related Activities (Physical)." Moreover, it is clear that the ALJ weighed Dr. Tankersley's opinion in accordance with the applicable factors.

Although Pass attempts to point to selective findings in Dr. Tankersley's evaluation that may support her opinions, these findings do not render the ALJ's decision unsupported by substantial evidence. To the extent that Pass challenges the ALJ's finding that the interpretation of Pass's 2012 MRI by Dr. Bucci as Pass's treating neurosurgeon was entitled to greater deference than the interpretation by the neuroradiologist, the court finds that such a determination was properly within the ALJ's province. Where, as here, the record contains conflicting medical evidence, it is the purview of the ALJ to consider and weigh the evidence, and resolve the conflict. See Craig, 76 F.3d at 589 (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]"); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (holding that it is the ALJ's responsibility, not the court's, to determine the weight of evidence and resolve conflicts of evidence). Further, although Dr. Bucci did not unequivocally state that there was no evidence of severe degenerative disc disease, he did not assess degenerative disc disease; rather, he assessed lumbar radiculopathy and stated that Pass presented with a nonsurgical situation at present, referring Pass to pain management specialist Dr. Jay S. Patel.

Furthermore, in discussing Pass's residual functional capacity, the ALJ indicated that he limited Pass to occasional climbing, balancing, stooping, kneeling, crouching, and crawling



"primarily because of the lumbar impairment, but also when considering the non-severe syncope." (Tr. 56.)  With regard to use of the cane, Dr. Tankersley checked a box indicating that Pass used a cane and a box indicating that it was medically necessary.  (Tr. 883.)  However, the ALJ noted that there was no evidence that Pass was prescribed a cane.  (Tr. 26, 30); <u>cf.</u> SSR 96-9p, 1996 WL 374185, at *7 ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).").  Thus, Pass has failed to demonstrate any error.

For all of these reasons, the court finds that Pass has not shown that the ALJ's decision with regard to Dr. Tankersley's opinion was unsupported by substantial evidence or reached through application of an incorrect legal standard.  <u>See</u> 20 C.F.R. §§ 404.1527(c), 416.927(c); <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001) (stating that "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight") (internal quotation marks and citation omitted).

       **2.**      **Dr. Jay Patel**

Dr. Jay Patel, a pain management specialist, began treating Pass in November 2012.  Pass challenges the ALJ's evaluation of a physical medical statement completed by Dr. Patel on June 25, 2013.  In this statement, Dr. Patel indicated that Pass could stand and/or walk for two hours in an eight-hour workday and without interruption for twenty minutes.  Dr. Patel further indicated that Pass could sit for four hours in an eight-hour workday and without interruption for thirty minutes.  Dr. Patel checked boxes indicating that Pass could never climb, bend/stoop, kneel, crouch, crawl,



and that he could frequently reach over his shoulder. Finally, Dr. Patel stated that Pass would need three breaks in the morning and three breaks in the afternoon. (Tr. 870-71.)

The ALJ stated that he had carefully considered Dr. Patel's opinions in accordance with SSR 96-2p and 20 C.F.R. § 404.1527. In evaluating this opinion, the ALJ stated as follows:

> In his *Medical Report*, Dr. Patel stated that the claimant had been a regular patient in this office beginning November 20, 2012, and his progress notes indicate he first saw the claimant on November 26, 2012, when the claimant reported chronic pain since a motor vehicle accident in the 1990s. Yet on April 24, 2012 Dr. Sherrill has stated that the laminectomy had resolved both the claimant's pain and radicular symptoms (Ex.21F). What is especially troubling, however, is that the claimant's presentation during that initial examination was starkly inconsistent with Dr. Bucci's observations two weeks earlier of some right leg giveway, but otherwise a normal physical examination, including 5/5 strength in all muscles, normal coordination, and gait (Ex.22F). In contrast, during Dr. Patel's examination the claimant exhibited a forward flexed body posture, a slow, guarded and antalgic gait, and severely restricted lumbar flexion and extension. While the claimant told Dr. Bucci, whom he had failed to see for 16 months after his single followup appointment, that he had pain in his right lower extremity, the claimant told Dr. Patel that he had 9/10 pain, with muscle cramps, muscular pain, muscle weakness, joint stiffness, elbow pain, wrist pain, back pain, low back pain, headaches, difficulty with balance, episodes of dizziness, numbness, tingling sensations, burning sensations, memory loss, decreased ability to concentrate, depressive symptoms, irritability, sleep disturbances, compulsive behaviors, and anxiousness/stress. I note in addition that while he told Dr. Patel he had tried physical therapy, the medical record indicates that the claimant was never sent to physical therapy.
>
> While Dr. Patel read the November 8, 2012 lumbar MRI report as indicating severe "degenerative disk disease with 15-S1 recurrent disc herniation to the right with mass effect on the right S1 transverse root" (Ex.29F), he does not appear to have actually seen the MRI, nor been aware that Dr. Bucc[i] had interpreted it as indicating scar tissue buildup with some "likely residual nerve root injury," but no evidence of significant nerve root entrapment or displacement, and thus was not a surgical candidate (Ex.22F). As Dr. Bucci is the claimant's treating neurosurgeon, I assign more weight to his interpretation of the lumbar MRI than to Dr. Patel's, whose area of medical specialty is Physical Medicine and Rehabilitation.
>
> While Dr. Patel prescribed him Lortab 10 (a narcotic) on November 26, 2012 (Ex.29F), on January 24, 2012 the claimant said he had stopped taking it because "it didn't help" and Dr. Patel prescribed no other pain medication. On musculoskeletal



examination he noted only "moderate generalized tenderness in the lumbar area. Flat back." While he treated him with epidural steroid injections on January 29, 2013 and February 11, 2013, on February 28, 2013 the claimant reported 0% pain relief from either injection. Examination that day again listed only "moderate generalized tenderness in the lumbar area. Flat back." Notably, when the claimant told him he had applied for disability, Dr. Patel stated, "Discussed with him that I do feel he is sedentary at best" (Ex.31F). There is no evidence Dr. Patel has seen him since then, and his two examinations in 2013 are inconsistent with the limitations described in his opinion, both dated four months after last seeing the claimant, as his opinion that he could do sedentary work.

. . . .

For the foregoing reasons, I cannot assign controlling weight to Dr. Patel's opinion, nor more than light weight.

(Tr. 53-54.)

Pass argues that the ALJ erred in failing to include Dr. Patel's opinion in his decision, to explain why Dr. Patel and Dr. Tankersley's opinions are not supportive of one another, and to realize that Dr. Patel was not relying on his own interpretation of the 2012 MRI but was relying on the neuroradiologist's interpretation of the MRI. Moreover, Pass argues that Dr. Bucci did not provide an opinion of Pass's residual functional capacity and challenges the discrepancies pointed out by the ALJ by arguing that there is no indication in Dr. Bucci's notes that Pass did not present to him with subjective complaints similar to the ones presented to Dr. Patel simply because Dr. Bucci did not record any. Additionally, Pass argues that Dr. Bucci's treatment notes fail to indicate that he performed any objective tests.

Upon review of the ALJ's decision and the record, the court concludes that the ALJ applied the relevant factors in evaluating Dr. Patel's opinion and finds that Pass has failed to demonstrate that the ALJ's decision to afford no more than light weight to Dr. Patel's opinion is unsupported by substantial evidence. See 20 C.F.R. §§ 404.1527(c), 416.927(c); Mastro, 270 F.3d at 178 (stating that "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other



substantial evidence, it should be accorded significantly less weight") (internal quotation marks and citation omitted). As stated above, the ALJ's finding regarding the differing interpretations of Pass's 2012 MRI was properly within the ALJ's purview because where, as here, the record contains conflicting medical evidence, it is the purview of the ALJ to consider and weigh the evidence, and resolve the conflict. See Craig, 76 F.3d at 589 (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]"); Hays, 907 F.2d at 1456 (holding that it is the ALJ's responsibility, not the court's, to determine the weight of evidence and resolve conflicts of evidence). Although Pass may point to selective evidence to support Dr. Patel's opinion, the court finds that such evidence does not render the ALJ's decision unsupported by substantial evidence. See Craig, 76 F.3d at 589 (defining "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance"); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1973) (indicating that regardless of whether the court agrees or disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence). For all of these reasons, the court finds that Pass has not shown that the ALJ's decision with regard to Dr. Patel's opinion was unsupported by substantial evidence or reached through application of an incorrect legal standard.

### 3.    Tim K. McConkey, M.Ed.

Finally, Pass argues that the ALJ failed to assign a weight to McConkey's opinion from his February 11, 2009 consultative examination.[8]  (Tr. 562-72.)  Pass acknowledges that the ALJ discussed portions of McConkey's opinion but failed to consider other aspects, thus warranting remand.  Specifically, Pass argues that McConkey found that Pass was capable of part-time work only.

The ALJ's decision reflects that in discussing Pass's borderline intellectual functioning, the ALJ acknowledged that

> in December 2008 the claimant began receiving Families First Assistance through the state of Tennessee, and in a review on February 11, 2009 he told Mr. McConkey he was in special education, failed two grades, and had "continuing difficulties with reading comprehension."  He said he took the driver's license test three times before passing, could not read all of his mail, and had no computer skills.  While Mr. McConkey diagnosed borderline intellectual functioning based on test scores, he stated that his "social adaptive functioning . . . is superior to what his FSIQ score would suggest he is capable."  While "clinical indicators support functional limitations in acquiring (encoding) written language and verbal comprehension . . . perceptual reasoning is a strength.  It is posited that Mr. Pass is a visual learner and benefits from demonstration and practice opportunities in training situations."  He opined that "from a cognitive perspective," the claimant could "carry out labor intensive job duties especially in a setting where he has opportunity to learn from demonstration and practice" (Ex. 1F).

(Tr. 36-37.)  In discussing Pass's depressive disorder, psychotic disorder, and anxiety disorder, the ALJ stated:

---

[8] Although the parties refer to McConkey as Dr. McConkey, the court notes that McConkey's signature block from his examination states:  "Tim K. McConkey, M.Ed., Senior Psychological Examiner, Health Service Provider" and indicates that he is licensed in Tennessee. (Tr. 572.) Senior psychological examiners in Tennessee are considered medical sources who are not acceptable medical sources.  See Grubb v. Comm'r of Soc. Sec., No. 1:12-cv-322, 2015 WL 418207, at *8 (E.D. Tenn. Feb. 2, 2015).



> During Mr. McConkey's psychological evaluation on February 11, 2009, the claimant said he had had no mental health care prior to January 2009, when he began treatment at Centerstone for anger management. He reported depressive symptoms, and said "his irritability, anger, racing thoughts, and insomnia were increasing in frequency and severity." Regarding activities of daily living, the claimant said he spent his days outside walking around, fishing or riding an ATV [all-terrain vehicle]. While unemployed, he said he "helps out occasionally" in his uncle's small engine repair shop. His wife managed his finances and most aspects related to family business. On mental status examination, Mr. McConkey observed that the claimant was fully oriented and alert, but his affect was rather dull and his mood was depressed. His diagnoses included Mood Disorder NOS, and he rated his GAF at 59-62. Given the claimant's ongoing treatment for anger management, Mr. McConkey stated that "an inability to navigate stress or even difficult personalities in the work-place may be issues for employment (Ex.1F).

(Tr. 38.) The ALJ also observed discrepancies between Pass's reports to McConkey and his reports elsewhere in the record. The ALJ further discussed subsequent treatment records, including those from Pass's treating psychiatrist, Dr. Ervin Prewelte, whom the ALJ found appeared to have discredited many of Pass's statements. The ALJ ultimately found, upon review of the longitudinal medical record, a questionable history of mental illness and that Pass gave conflicting reports regarding his mental health history, symptoms, and diagnoses. (Tr. 44.)

As an initial matter, as pointed out by the Commissioner, McConkey recommended that Pass be required to pursue part-time work; however, his opinion does not indicate that Pass is precluded from full-time work. (Tr. 571.) Moreover, McConkey suggests that Pass's ability to work be reassessed in three to six months after additional records are made available, which would not support a finding of permanent disability. (Tr. 572.) In this case, the ALJ considered the entire longitudinal record during the course of his 48-page decision in evaluating the evidence and ultimately arriving at Pass's residual functional capacity. Thus, even assuming without deciding that the ALJ erred in failing to expressly state what weight he was giving to the opinion of a medical



source who is not an acceptable medical source, Pass has not carried his burden to show how such an error harmed him.  See Tanner v. Comm'r of Soc. Sec., 602 F. App'x 95, 101 (4th Cir. 2015) (finding, in spite of the ALJ's error, reversal not warranted where it was "highly unlikely, given the medical evidence of record, that a remand to the agency would change the Commissioner's finding of nondisability"); Bishop v. Comm'r of Soc. Sec., 583 F. App'x 65, 67 (4th Cir. 2014) (applying the harmless error doctrine in the social security context and stating that "even assuming Chenery is applicable, any error is reviewed under the harmless error doctrine. Thus, if the decision 'is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time' ") (quoting Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010)).

**C.    Residual Functional Capacity**

Pass's argument regarding his residual functional capacity is twofold.  First, Pass, relying on the recent decision by the United States Court of Appeals for the Fourth Circuit in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), argues that the residual functional capacity as determined by the ALJ fails to account for his finding that Pass had "moderate limitations" with concentration, persistence, or pace at Step Three of the sequential evaluation.  In Mascio, the Fourth Circuit held that remand was warranted in part because the ALJ's hypothetical question to the vocational expert was legally insufficient in that it failed to include—without any explanation by the ALJ—the ALJ's finding of moderate limitation on the claimant's ability to maintain concentration, persistence, or pace at Step Three.  Mascio, 780 F.3d at 638.  The Fourth Circuit stated that it "agree[d] with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.' "  Id. (quoting



Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011) (joining the Third, Seventh,

and Eighth Circuits)). However, the Court continued stating:

> Perhaps the ALJ can explain why Mascio's moderate limitation in concentration,
> persistence, or pace at step three does not translate into a limitation in Mascio's
> residual functional capacity. For example, the ALJ may find that the concentration,
> persistence, or pace limitation does not affect Mascio's ability to work, in which case
> it would have been appropriate to exclude it from the hypothetical tendered to the
> vocational expert. But because the ALJ here gave no explanation, a remand is in
> order.

Mascio, 780 F.3d at 638 (citation omitted).

Contrary to Pass's conclusory argument, his case is not directly on point with Mascio. Unlike

in Mascio, the ALJ in Pass's case provided a detailed discussion of his limitations stemming from

his mental impairments in performing the residual functional capacity assessment. Specifically, the

ALJ found as follows:

> The mental residual functional capacity was establish[ed] considering the claimant's
> borderline intellectual function, depressive disorder, psychotic disorder and anxiety
> disorder. Considering the combined effects of the claimant's mental impairments I
> concluded mental limitations are more restrictive [than] considering the impairments
> individually. Consequently, I limited the claimant to simple one two step tasks with
> no contact with the public and frequent contact with coworkers and supervisors. The
> medical history, signs and laboratory findings, effects of treatment, reports of
> activities of daily living, medical source statements and effects of symptoms have
> been set forth in detail in my consideration of mental impairments starting on page
> 25 above and in my "B" criterion analysis starting at page 8 above. Mental status
> examinations performed at Pickens mental health center are persuasive in concluding
> the claimant is capable of performing within my mental residual functional capacity.
> Mental status examinations repeatedly reveal the claimant is alert and oriented, has
> normal appearance, cooperative behavior, no psychomotor abnormalities, normal
> speech, intact attention concentration and memory, with variable judgment and
> insight (Exhibits 34F, 30F and 10F). Reports with respect to hallucinations are
> conflicting with recent records indicating hallucinations and earlier records indicating
> somewhat vague and contradictory symptomology; does not appear to meet the
> diagnostic criterion for major depression; as for hallucinations not even sure if this
> is an auditory hallucination (Exhibits 10F6 and 34F). In establishing the mental
> residual functional capacity, I considered the mental longitudinal history. Briefly, the



mental longitudinal history reveals the claimant to be alert and oriented times 3 (Exhibits 28F, 24F, 20F, 19F and 9F). Mr. Pass has been reported to have normal mental status examination, appropriate speech, appropriate thought content and perception, normal cognitive function no impairment of concentration, attention, memory with appropriate affect (Exhibits 27F, 20F, 13F, and 10F). Finally, the opinion evidence has been considered in establishing the mental and physical residual functional capacity as set forth in the preceding section.

(Tr. 56-57.)

To the extent that Pass contends that greater limitations should have been included in his residual functional capacity based on Pass's assertion that McConkey opined that Pass would have difficulties with anger management and an inability to handle stress, the court observes that the ALJ specifically observed this aspect of McConkey's evaluation in discussing the evidence. (Tr. 38.) However, the ALJ also noted later reports discussing Pass's alleged anger, including a report from Dr. Prewelte, Pass's treating psychiatrist, which the ALJ found discredited Pass's allegations. Moreover, for the reasons discussed above, Pass has failed to demonstrate that any greater limitations are warranted from McConkey's evaluation.

Also in the context of his residual functional capacity, Pass argues that the ALJ erred in failing to discuss whether Pass's use of a cane was medically necessary. Pass relies on medical records indicating that Pass presented with a cane and had give away weakness in his leg, as well as the fact that Dr. Tankersley checked the box indicating that the cane was medically necessary. Pass points out that the vocational expert testified that an individual with Pass's residual functional capacity that required a cane to ambulate would not be able to perform the jobs cited. However, as discussed above, the ALJ found that there was no evidence that Pass was prescribed a cane. (Tr. 26, 30.) Moreover, Pass has not pointed to any evidence "describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and



any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7 ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).").

Thus, Pass has failed to demonstrate that the ALJ erred in assessing his residual functional capacity.

## D.    Credibility

Pass further argues that the ALJ erred in evaluating his subjective complaints. In evaluating subjective complaints, the United States Court of Appeals for the Fourth Circuit has stated that "the determination of whether a person is disabled by pain or other symptoms is a two-step process." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). It appears that in this matter only the second step is at issue,[9] during which the ALJ must expressly consider "the intensity and persistence of the claimant's [symptom] and the extent to which it affects [his] ability to work." Id. In making these determinations, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2. "[A]llegations concerning the intensity and persistence of pain or other symptoms may not be disregarded *solely*

---

[9] The first step requires there to "be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig, 76 F.3d at 594 (internal quotation omitted).



because they are not substantiated by objective medical evidence." Id. at *6 (emphasis added). "This is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs [his] ability to work." Craig, 76 F.3d at 595. A claimant's subjective complaints "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the [symptoms] the claimant alleges []he suffers." Id. The social security regulations inform claimants that in evaluating subjective complaints, the Commissioner will consider the following relevant factors:

> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ addressed Pass's credibility at length, including numerous inconsistencies between Pass's reports and the medical and nonmedical records. (Tr. 22-47.) Some examples of these inconsistencies are succinctly summarized by the Commissioner as follows:

> o In February 2009, Plaintiff spent his days outside walking around, fishing, or riding an ATV (Tr. 18, 563-64);



- In the function reports that he completed in connection with his disability application, Plaintiff reported that he played with his young daughter for "most of the day," cleaned, made household repairs, mowed the lawn, drove a car, shopped in stores, and went fishing (Tr. 18, 433-39, 459-64);
- In April 2010, Plaintiff reported to his provider that he went wilderness hiking and camping almost every weekend, in July 2010, he had been doing a lot of traveling with his family, including interstate trips to Tennessee and Ohio (Tr. 15, 677, 681);
- Additionally, there was evidence that Plaintiff was working "under the table" in 2009 and 2010 (Tr. 14, 563, 644, 689);
- After his back surgery, Plaintiff continued to travel so extensively that he missed his follow up appointment with Dr. Bucci (Tr. 32, 757);
- At the 2013 hearing, Plaintiff testified that [he] remained able to prepare meals occasionally, drive, wash dishes and laundry, visit with a neighbor, ride in a neighbor's car to Tennessee, take out the trash, go to church every Sunday, and go to the convenience store (Tr. 19, 115-19, 134, 208); and
- In June 2013, Plaintiff reported that used a TENS unit, but took no medication for back pain (Tr. 23, 28, 502).

(Def.'s Br. at 29-30, ECF No. 20 at 29-30.)

Pass attempts to challenge a couple of the reasons offered by the ALJ, arguing that the record shows that he was prescribed medication that he could either not afford or that was not effective and that the ALJ failed to consider Pass's memory problems and borderline intellectual functioning in addressing the inconsistencies in Pass's reports. Upon review of Pass's arguments and the record in this matter, the court disagrees that remand is warranted on these bases. The lengthy discussion provided by the ALJ reveals that he considered numerous inconsistencies, both medical and non-medical in the record. Contrary to Pass's conclusory assertion, there is no evidence that the ALJ viewed the process as adversarial or was trying to play a "gotcha game" with Pass. Further, the ALJ specifically addressed Pass's allegations of limitations from borderline intellectual functioning. Thus, upon review of the records as a whole and the parties' briefs, the court finds that Pass has



failed to demonstrate that the ALJ's determination that Pass was not entirely credible is unsupported or controlled by an error of law.

Even assuming that Pass's arguments could support his allegations of disabling symptoms, it is clear that the ALJ carefully considered the evidence in this matter.  As stated above, it the ALJ's duty to weigh credibility, and the court finds the ALJ's conclusion within the bounds of substantial evidence.  See Craig, 76 F.3d at 589 (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]").  Further, the ALJ's decision clearly reflects that he considered the applicable factors in weighing Pass's subjective complaints and ultimately finding that they were not wholly credible. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  Although Pass's subjective complaints "may not be disregarded solely because they are not substantiated by objective medical evidence," SSR 96-7p, 1996 WL 374186, at *6, the ALJ properly considered the objective medical evidence and other objective evidence in evaluating Pass's complaints and the extent to which they impair his ability to work.  See Craig, 76 F.3d at 595.  Therefore, the court finds that Pass has failed to demonstrate that the ALJ's credibility analysis as a whole is unsupported by substantial evidence or controlled by an error of law.  See Hines v. Barnhart, 453 F.3d 559, 565 n.3 (4th Cir. 2006) (noting that a claimant's allegations "need not be accepted to the extent that they are inconsistent with available evidence"); Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (*per curiam*) (finding that the ALJ may properly consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the credibility of the plaintiff's subjective complaints); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1973) (indicating that even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence).



E.    **Listing 1.04A**

At Step Three, the Commissioner must determine whether the claimant meets the criteria of one of the Listings and is therefore presumptively disabled.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."  Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis added).  It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment.  20 C.F.R. §§ 404.1525(d), 416.925(d); see also Bowen v. Yuckert, 482 U.S. 137, 146 (1987) (noting that the burden is on the claimant to establish that his impairment is disabling at Step Three); Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (same).  The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. Additionally, when a claimant has more than one impairment, the ALJ must consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923.

At Step Three, the ALJ found that Pass "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."  (Tr. 17.)  Pass argues that the ALJ erred in failing to properly consider whether Pass's

impairments met or medically equaled Listing 1.04A.[10]  In this case, the ALJ explicitly discussed whether Pass's impairments met or equaled the requirements of Listing 1.04 and found that they did not.  However, Pass argues that the ALJ failed to acknowledge that in <u>Radford v. Colvin</u>, 734 F.3d 288 (4th Cir. 2013), the United States Court of Appeals for the Fourth Circuit held that:

> Listing 1.04A requires a claimant to show only what it requires him to show:  that each of the symptoms are present, and that the claimant has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months. 20 C.F.R. § 404.1509.  A claimant need not show that each symptom was present at precisely the same time—i.e., simultaneously—in order to establish the chronic nature of his condition.  Nor need a claimant show that the symptoms were present in the claimant in particularly close proximity.  As the Commissioner recognizes, "abnormal physical findings may be intermittent," but a claimant may nonetheless prove a chronic condition by showing that he experienced the symptoms "over a period of time," as evidenced by "a record of ongoing management and evaluation." (App. Br. 25) (quoting 20 C.F.R. Part 404, Subpart P, 1.00D).  To require proximity of findings would read a new requirement into the listing that is unsupported by the text, structure, medical practice, or common sense, and we decline to do so.

<u>Id.</u> at 294.

In this case, the ALJ stated that he considered whether Pass's lumbar degenerative disc disease met or equaled the criteria of Listing 1.04 and found that it did not.  Specifically, the ALJ stated as follows:

---

[10] This Listing provides in pertinent part:
> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). . . .



While on February 17, 2011 Michael Bucci, MD, FACS, the claimant's treating neurosurgeon, stated that his lumbar MRI was positive for a large disc herniation at L5-S1 on the right with right S1 nerve root compression and positive straight leg raising on the right (Ex.27F), his condition was resolved by surgery (right L5-S1 laminectomy, facetectomy, foraminotomy, and discectomy) on March 14, 2011. While the claimant was out of town for a month and consequently missed his followup appointment, when Dr. Bucci did see him on May 17, 2011 his physical examination was normal (Ex.27F). Thus his condition did not meet the durational criteria for a severe impairment. On April 24, 2012 Dr. Sherrill stated that the laminectomy had resolved his lumbar pain and his radicular symptoms (Ex.21F). The claimant did not return to see Dr. Bucci for 16 months, but examination on October 11, 2012 showed normal (5/5) muscle strength in all muscles, normal reflexes, coordination, and gait, except for some giveaway weakness in the right leg. On November 8, 2012 Dr. Bucci stated that a recent lumbar MRI showed "some disc bulging rostral to the nerve root exit on the right at L5-S1. The area enhances significantly consistent with scar tissue and possibly some small disc bulge. The nerve root is not trapped or displaced." He concluded the claimant "likely has some residual nerve root injury." (Ex.22F). It did not, however meet or equal listing 1.04.

(Tr. 17-18.) Thus, unlike <u>Radford</u>, the ALJ in this case found that Pass's condition had resolved, not simply that his symptoms were not simultaneously present. Therefore, the court finds that Pass has failed to demonstrate that the ALJ's analysis runs afoul of the holding in <u>Radford</u>. Moreover, to the extent that Pass's argument relies on the interpretation of the 2012 MRI by the neuroradiologist as opposed to the interpretation by Dr. Bucci, which was credited by the ALJ, for all of the reasons discussed above, Pass has failed to demonstrate that the ALJ erred in weighing this evidence.

**RECOMMENDATION**

For the foregoing reasons, the court finds that Pass has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard.  See Craig, 76 F.3d at 589; see also 42 U.S.C. § 405(g); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  The court therefore recommends that the Commissioner's decision be affirmed.

November 24, 2015                                   Paige J. Gossett
Columbia, South Carolina                   UNITED STATES MAGISTRATE JUDGE

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).